UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| SUZON J., | : | |
| | : | |
| *Plaintiff,* | : | |
| | : | |
| v. | : | No. 3:23-cv-868 (MPS) |
| | : | |
| KILOLO KIJAKAZI, | : | |
| | : | |
| *Defendant.* | : | |

## RECOMMENDED RULING

Plaintiff brings this administrative appeal from the decision of the Commissioner of the

Social Security Administration denying his application for supplemental security income.  For

the reasons below, the undersigned recommends that plaintiff's Motion to Reverse the Decision

of the Commissioner, ECF 17, be DENIED, and the Commissioner's Motion to Affirm, ECF 20,

be GRANTED.

### A.  LEGAL STANDARDS

#### 1.  Disability and eligibility

A claimant is disabled under the Social Security Act if he or she is "unable to engage in

any substantial gainful activity by reason of any medically determinable physical or mental

impairment which can be expected to result in death, or which has lasted or can be expected to

last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A).  Title XVI

provides for supplemental security income benefits to claimants who are indigent and disabled,

without reference to prior work.  *See* 42 U.S.C. § 1381 *et seq.*

#### 2.  Commissioner's five-step review

The Commissioner of Social Security is authorized to make findings of fact and decide

disability applications, *see* 42 U.S.C. § 1383(c)(1)(A), in accordance with the five-step

sequential evaluation process provided in 20 C.F.R. § 416.920.  (1) First, the Commissioner

determines whether the claimant is currently engaged in substantial gainful activity.  (2) If not,

the Commissioner determines whether the claimant has a medically determinable impairment or

combination of impairments that are "severe," meaning that it "significantly limits" the

claimant's physical or mental ability to do basic work activities.  (3) If the claimant has a severe

impairment or combination of impairments, the Commissioner evaluates whether, based solely

on the medical evidence, the claimant has an impairment that "meets or equals" an impairment

listed in Appendix 1, Subpart P, No. 4 of the regulations (the "Listings") and that either is

expected to result in death or has lasted or will last for at least 12 months. [1]  If so, the claimant is

disabled.  (4) If not, the Commissioner determines whether, despite the severe impairment, the

claimant has the residual functional capacity ("RFC") to perform his or her past work. [2]  (5) If

not, the Commissioner determines whether there is other work in the national economy which

the claimant can perform in light of his or her RFC, age, education, and work experience.  *See* 20

C.F.R. § 416.920.  The claimant bears the burden of proof on the first four steps, and the

Commissioner bears the burden of proof on the final step.  *McIntyre v. Colvin*, 758 F.3d 146, 150

(2d Cir. 2014).

The Commissioner's authority to make these findings and decisions is delegated to an

administrative law judge ("ALJ").  *See* 20 C.F.R. § 416.1429.  A claimant may request review of

an ALJ's decision by the Appeals Council.  *See* 20 C.F.R. § 416.1467.  If the Appeals Council

---

[1] *See* 20 C.F.R. § 416.909 (duration requirement).

[2] Residual functional capacity is the most a claimant can do in a work setting despite his or her limitations.  20 C.F.R. § 404.1545.

declines review or affirms the ALJ's decision, the claimant may appeal to the United States District Court.  42 U.S.C. §§ 405(g), 1383(c)(3).

### 3.  Court's review on appeal

A district court reviewing the Commissioner's final decision is performing an appellate function, *see Zambrana v. Califano*, 651 F.2d 842, 844 (2d Cir. 1981), and has the power to affirm, modify, or reverse the Commissioner's decision based on its review of the briefs and the administrative record.  *See* 42 U.S.C. § 405(g).  "A district court may set aside the Commissioner's determination that a claimant is not disabled only if the factual findings are not supported by substantial evidence or if the decision is based on legal error."  *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000) (internal quotation marks omitted).

## B.  BACKGROUND

### 1.  Procedural History

On December 17, 2019, plaintiff filed an application for disability insurance benefits alleging a disability onset date of August 8, 2018.  R. 179-200.  The claim was denied at the initial review and reconsideration levels, and plaintiff requested a hearing.  R. 89-92; R. 106-08. On April 13, 2022, ALJ Dierdre R. Horton conducted a video hearing at which plaintiff and a vocational expert testified.  R. 33-64.  On May 4, 2022, the ALJ issued a written decision denying plaintiff's claim.  R. 15-28.  Plaintiff's request for review was denied by the Appeals Council, R. 1-6, and plaintiff filed this action on June 30, 2023.

### 2.  List of impairments

Plaintiff was 47 years old at the alleged disability onset date of August 8, 2018.  ECF 179.  In her May 2022 Decision, the ALJ found that plaintiff had severe impairments (degenerative joint disease of the knees; multilevel disc disease of the cervical spine;

posttraumatic stress disorder (PTSD); hearing loss; vision loss; and polysubstance abuse) and non-severe impairments (traumatic brain injury with cognitive issues and headaches, and history of bunion surgery). R. 18. Plaintiff argues in her brief that her cervical spine, knee, and cognitive impairments are more limiting than the ALJ found. ECF 17-1.

### 3. Medical evidence

The first treatment note in the medical record indicates that in August 2017 plaintiff was diagnosed with a right knee meniscus tear and had also had a bunionectomy. R. 1889.

#### a. 2018 TBI and cognitive issues

In March 2018 plaintiff was treated at the emergency room ("ER") after a motor vehicle collision. R. 497-557. Diagnostic imaging was negative, including CT scans of the head and cervical spine and x-rays of the chest, knees, and right lower leg. R. 502. The differential diagnosis was traumatic head and lower extremity injuries. *Id.* Tangentially, the cervical spine study showed multilevel degenerative changes at C5-6 and C6-7, including ridging, spurring, facet arthropathy, moderate to severe foraminal narrowing, and mild central canal stenosis. R. 529.

Plaintiff attended physical therapy twice in April 2018 and once in September 2018. R. 315-22.

Plaintiff had an initial consultation with physiatrist David Tung, M.D. in May 2018, where she complained of neck, shoulder, arm, back and leg pain. R. 323-24. Dr. Tung diagnosed post-concussive headaches, neurocognitive deficits in attention, short term memory, and word finding, and emotional lability. R. 324. He also diagnosed strain of the cervical and lumbar spines with muscle spasms; acute left shoulder impingement; acute left arm, hand, and leg parasthesias; and sleep disruption. He ordered MRIs, referred plaintiff for a neurocognitive

evaluation, prescribed physical therapy and pain and spasm medications, and restricted her to light duty for four weeks.  *Id.*  At a June 2018 visit, Dr. Tung cited a cervical MRI in May 2018 confirming degenerative changes from C2-3 to C6-7.  R. 325.  He added aggravation of cervical spine bulges and stenosis to his assessment and prescribed a cervical collar.  R. 326.  In July 2018, Dr. Tung noted a negative lumbar MRI taken in June 2018.  R. 327.  He diagnosed traumatic brain injury based on plaintiff's symptoms of headache, sleep difficulty, word finding difficulty and forgetfulness, and emotional lability.  R. 328.  He prescribed fioricet for headaches and replaced the spasm medication.  R. 328.  At an August 9, 2018 follow-up, plaintiff reported improved leg pain but no other material changes.  R. 329-30.

Three days later, on August 12, 2018, plaintiff visited the ER seeking assistance with heroin detoxification.  She stated that she had stopped using for three days and went through withdrawal, and then used again to alleviate withdrawal symptoms.  R. 560.  She was discharged with literature regarding potential detox facilities.  R. 561.

Two weeks later, on August 28, 2018, plaintiff obtained a neurocognitive screening from Mary Cheyne, Psy.D. on referral from Dr. Tung.  R. 591-95.  Testing showed "a variable set of cognitive skills, spanning the low average to average range," with word finding difficulty; difficulty in concentrating and memory; and challenges in the domain of working memory.  R. 594-95.  Plaintiff also reported emotional volatility.  R. 595.

At a follow-up with Dr. Tung in September 2018, plaintiff again reported no material improvement.  R. 331.  Dr. Tung reviewed the neurocognitive screening and found it consistent with plaintiff's reported difficulties.  R. 331.  He prescribed medications for nerve pain and for nausea and anxiety related to TBI, renewed his referral for a brain MRI, and recommended a

concussion treatment program.  R. 332.  On October 15, 2018, plaintiff reported that the medications were only mildly helpful.  R. 333.

At each of plaintiff's six visits with Dr. Tung between April and October 2018, he extended the light duty work restriction by four more weeks.  R. 323-34.  At no time did Dr. Tung indicate awareness of plaintiff's heroin use.  *Id.*  In October 2018, Dr. Tung referred plaintiff to the Ahlbin Center for speech/neurocognitive therapy and social work evaluations.  R. 584-87.  However, she "no showed" at the November 6, 2018 appointment and did not respond to a voicemail.  R. 597.

### b.  Substance use, housing, and mental health issues; Only two medical encounters between October 2018 and June 2020

The next treatment note is dated almost a year after the October 2018 visit with Dr. Tung. On August 28, 2019, plaintiff went to the ER with complaints of chronic left knee pain, depression with suicidal ideation and hallucinations, and panic attack.  R. 601.  A left knee x-ray showed no acute osseous abnormality with tricompartmental degenerative osteoarthrosis.  R. 603.  Plaintiff tested positive for methadone, 6-acetylmorphine, opiate and benzodiazepine.  R. 603.  She was living "house to house" and reported that she used heroin more than three times per week to cope with pain.  R. 604.  She also reported hallucinations including conversation with her deceased father and sister.  R. 604.  She was discharged with a small prescription of Atarax for anxiety.  R. 625.

Plaintiff filed her SSI application on January 9, 2020 with a protective filing date of December 17, 2019.  R. 179-200.  The application, which she completed with the assistance of an aid worker at Operation Hope, indicates that she had been homeless since being evicted in October 2018.  R. 198-99.  The impairments described in her application were "low" vision, hearing loss in left ear, osteoarthritis, and chronic depression.  R. 181, 199.

The next treatment note is from an ER visit six months later on February 25, 2020 for complaints of cough, nasal congestion, and chest pain.  R. 642.  Based on an abnormal EKG and a chest x-ray suggestive of chronic obstructive pulmonary disease (COPD), plaintiff was held for observation telemetry.  R. 648-49, 683.  She stated that she was homeless and did not want male visitors.  R. 663.  Plaintiff reported using two bags of heroin every other day, and that she had been living with someone who was financing her habit and was verbally abusive.  R. 679, 689-90.  She was diagnosed with pneumonia and opiate withdrawal and was released after two days, at which time she planned to relocate to New Jersey near family.  R. 693-94.

### c.  Psychiatric issues in June and July 2020

Plaintiff returned to the ER on June 28, 2020 with complaints of anxiety, shortness of breath, numbness, and chest pain.  R. 831.  She reported being in methadone treatment and was given medication for hypertension and anxiety.  R. 839, 866.  Plaintiff complained of auditory and visual hallucinations and displayed paranoia during a psychiatric consult, but these symptoms resolved by the next day, and she was cleared for discharge with instruction to follow up with the methadone treatment provider.  R. 839, 875, 879, 883, 885.

Plaintiff was back in the ER on July 5, 2020 stating that she tried to start rehabilitation but was told she needed to go to the hospital for clearance.  R. 1016.  She was still using heroin and Xanax.  R. 1018.  She was discharged with a list of treatment facilities.  R. 1020.

Plaintiff returned to the ER two days later on July 7, 2020 complaining of auditory hallucinations, anxiety, and paranoia.  R. 1056.  Her last methadone treatment had been eleven days prior.  R. 1056.  Plaintiff agreed to inpatient psychiatric treatment for possible withdrawal and new onset psychosis.  R. 1056.  There she presented with prominent persecutory delusions. R. 1083.  She tried Abilify, Zyprexa, and Lexapro but refused to continue after one dose each.

7

R. 1109.  Nonetheless, her mental status improved, and she was no longer experiencing

hallucinations, delusions or paranoia and had clear and goal-directed thought processes.  R.

1084-97.  She was discharged to outpatient psychiatric care.  R. 1120-21.

### d.  Treatment at the VA

On August 24, 2020, plaintiff went the ER at the Veteran's Affairs ("VA") hospital

complaining of anxiety.  R. 475.  Plaintiff declined inpatient treatment and was prescribed

Remeron for unspecified anxiety disorder and major depressive disorder.  R. 477-78.

The next day, plaintiff had a telephonic visit with VA PCP Olivia Sorial, M.D.  R. 2301-

03.  Plaintiff requested continuation of her hypertension medications.  *Id.*  She reported that she

was living with her mother but did not disclose her history of substance abuse.  *Id.*

On September 1, 2020, plaintiff had a telephonic visit with VA psychiatrist Jayakanthi

Dealwis, M.D.  R. 2296-97.  Based on plaintiff's reports of anxiety and sexual trauma in

childhood and in the military, Dr. Dealwis diagnosed PTSD/MST and generalized anxiety

disorder.  R. 2297.  Plaintiff told Dr. Dealwis that various medications had failed to treat her

anxiety and that only Xanax worked.  R. 2297.  She did not inform Dr. Dealwis of her history of

heroin and Xanax abuse, and Dr. Dealwis increased her Remeron and also prescribed Xanax.  R.

2297.

Plaintiff met telephonically with VA psychologist Tonisha Joanis in September and

October 2020.  R. 2285, 2287.

### e.  Overdoses in October and November 2020

The record of a Milford Hospital ER visit on November 4, 2020 indicates that plaintiff

was found unresponsive on October 29 and was taken to a hospital in Newark where she left

against medical advice; was found unresponsive again on October 30 and went to St. Vincent's

hospital where she tested positive for fentanyl and benzodiazepines and left against medical advice again.  R. 1611.  On November 4, she was found unresponsive and brought to the ER by her boyfriend where she again tested positive for benzodiazepines and opiates.  R. 1602, 1611. A CT scan of the brain was suspicious for hypoxia, carbon monoxide poisoning, or toxic encephalopathies and an MRI was recommended.  R. 1620.  She was cleared for stepdown from ICU to the psychiatric ward two days later.  R. 1645.  She had several pseudo-seizure events on November 7 and 8 while waiting for a bed, and the attending was skeptical that it might be attention-seeking behavior and should be assessed psychologically.  R. 1668.  Plaintiff resisted inpatient psychiatric treatment but finally agreed.  R. 1668-89, 1704.  She stayed in the psychiatric ward for two days.  R. 1386-88.  The hospital contacted Dr. Dealwis and alerted her to plaintiff's history of substance abuse.  R. 1388.

### f.   Continued VA care

On November 25, 2020, plaintiff met telephonically with VA psychiatrist Cecilia Fleser, M.D., who was covering for Dr. Dealwis, and obtained a Xanax refill.  R. 2278-79.  On December 14, Dr. Dealwis advised plaintiff that she was discontinuing Xanax due to plaintiff's history of opiate abuse.  R. 452.  On January 14, 2021, Dr. Dealwis adjusted medications at a telephonic visit.  R. 2439-40.

In December 2020 (telephonic) and March 2021 (in person), plaintiff visited PCP Dr. Sorial and discussed overall health including chest pain, electrolyte abnormality, depression and anxiety, hypertension, hyperlipidemia, tobacco use, and foot pain post-bunion surgery.  R. 407-08, 2275-77.

### 4. Consultative examinations

On March 8, 2021, internist Herbert Reiher, M.D. performed a consultative examination in connection with plaintiff's SSI application. R. 340-43. His diagnoses were knee pain; shoulder pain; traumatic brain injury; hypertension; decreased vision in left eye; and hearing loss in left ear; however, it is unclear whether his summation was based on a review of the medical record or plaintiff's self-reported history. R. 343. On examination, Dr. Reiher observed that plaintiff's cervical spine showed flexion/extension and lateral flexion of 40 degrees each, with full rotation bilaterally; her right shoulder forward elevation was 120 degrees and her left shoulder had full range of motion; and her right knee flexion was 120 degrees with full range of motion in her left knee. R. 342. Dr. Reiher opined:

> The claimant has mild postural limitations due to knee and shoulder pain producing mild limitations with climbing, stooping, bending, crawling, kneeling, crouching, and reaching. The claimant has no fine motor limitations. The claimant has no speech limitation. The claimant has moderate visual limitation due to decreased vision of the left eye. The claimant has mild hearing limitation due to decreased hearing of the left ear. The claimant has environmental limitations of heights, which could produce decreased balance.

R. 343.

On March 17, 2021, psychologist Marc Hillbrand, Ph.D. examined plaintiff via video. R. 345-48. He noted that he did not review any records other than the disability application. R. 345. Plaintiff admitted to heroin use but reported being sober for about a year with no relapses. R. 346. On examination, Dr. Hillbrand noted moderate psychomotor retardation, some attention and concentration challenges, and possible judgment problems. R. 345-46. However, her other mental functions were in the average range on COGNISTAT testing. R. 346. He further noted: "Speech articulation is within normal limits. Her speech is soft and slowed. Thought content is

appropriately varied.  Thought processes are coherent, logically linked and ruminative."  R. 347.

Dr. Hillbrand assessed the following functional impairments:

| | |
|---|---|
| Making judgments on simple work-related decisions | Mild |
| Understand, remember, and carry out complex instructions | Mild |
| Make judgments on complex work-related decisions | Mild |
| Interact appropriately with the public, supervisors, and coworkers | Moderate |
| Respond appropriately to usual work situation and changes in routine | Moderate to marked |
| Maintain attention, concentration and pace | Moderate to marked |

R. 348.

### 5.  Treatment after consultative exams

In June 2021, several x-rays were ordered by neurologist Samuel Bridgers, M.D., who does not appear elsewhere in the record.  R. 1550-52.  In the cervical spine there was multilevel degenerative disc space narrowing and spondylosis, similar to previous studies.  R. 1550. Plaintiff's right knee showed tricompartmental degenerative joint disease that was mildly worse than the previous study.  R. 1551.  (Elsewhere the records indicate a past surgical history of right knee arthroplasty.  *See*, *e.g.*, R. 495.)  Her right shoulder was unremarkable.  R. 1552.

In May (video), July (telephonic), October (video), and November 2021 (video), plaintiff visited with VA psychiatrist Dr. Dealwis who adjusted medications for depression and anxiety. R. 394, 2400-01, 2402, 2404.  On January 3, 2022 (video), plaintiff reported to Dr. Dealwis that she had not used alcohol or drugs for almost 1.5 years.  Dr. Dealwis continued adjusting plaintiff's depression and anxiety medications.  R. 2476.

### 6.  Subjective reports

At the hearing on April 13, 2022, plaintiff testified about three predominant symptoms or impairments: headaches, knee pain, and psychological issues.  R. 33-54.

Plaintiff testified that she suffers from migraines and daily debilitating headaches following her car accident in 2018.  R. 42-43.  She said the headaches also caused light

sensitivity, muscle spasms, and fainting but she denied taking any headache medications.  R. 42-44, 50.

Plaintiff also testified that she had knee pain and knee swelling, could only walk about half a block, and elevates her knee at knight and two to three hours during the day.  R. 45-47. She said she had difficulty standing and balancing since January and suggested the cause was arthritis or TBI.  R. 45-46.  Plaintiff alleged the onset of her balance issues was "in January."  R. 46.

Plaintiff testified that she had word finding and memory problems.  R. 47.  She alleged that she suffers from intrusive memories relating to post-traumatic stress disorder that induce nightmares and insomnia.  R. 47-48.  She also reported general anxiety and paranoia.  R. 49.

### C.  The ALJ's Decision

In the May 4, 2022, decision, the ALJ found at Step 1 that plaintiff had not engaged in substantial gainful activity since the date of the disability finding.  R. 18.  At Step 2 she found the following severe impairments: degenerative joint disease of the knees; multilevel disc disease of the cervical spine; posttraumatic stress disorder (PTSD); hearing loss; vision loss; and polysubstance abuse; however, she found plaintiff's TBI, cognitive issues, and headaches were non-severe.  R. 18.  At Step 3, the ALJ found that these impairments do not meet or medically equal a listed impairment. R. 19. The ALJ then determined the plaintiff had the residual functional capacity

> to perform light work as defined in 20 C.F.R. 416.967(b) except: occasional ramps/stairs; no ladders/ropes/scaffolds; occasional balancing, stooping, kneeling, crouching, and crawling; she must avoid concentrated exposure to extreme cold, hazardous machinery, and unprotected heights; simple, routine tasks; no production pace work; occasional interaction with the general public; no more than a moderate noise environment; no work that requires depth perception.

R. 21.  At Step 4, the ALJ determined plaintiff was unable to perform any relevant past work, and at Step 5 determined that there existed jobs in significant numbers in the national economy that plaintiff could perform considering her residual functional capacity.  R. 25-27.  The ALJ therefore concluded that plaintiff was not disabled within the meaning of the Social Security Act from December 17, 2019 to the date of decision.  R. 27-28.

### D.  DISCUSSION

Plaintiff raises three claims of error: (1) there are gaps in the record, including no medical source statements from certain treating physicians; (2) the ALJ should have found a severe cognitive impairment at Step 2; and (3) the vocational expert's testimony on the number of jobs in the national economy that plaintiff could perform was unreliable.  None of the claims of error is availing.

#### 1.  Gaps in the medical record

Citing the ALJ's duty to develop the administrative record, plaintiff first argues that the ALJ (a) failed to fill in gaps in the medical history and (b) failed to obtain source statements from physiatrist Dr. Tung, VA psychologist Dr. Dealwis, or VA PCP Dr. Sorial.  It is well established that "where there are deficiencies in the record, an ALJ is under an affirmative obligation to develop a claimant's medical history even when the claimant is represented by counsel or by a paralegal."  *Rosa v. Callahan*, 168 F.3d 72, 79 (2d Cir. 1999) (cleaned up); 20 C.F.R. § 404.1512(b)(1) (agency must develop "complete medical history" from at least 12 months prior to application).  The reverse is also true: the ALJ is not obligated to seek additional information "where there are no obvious gaps in the administrative record."  *Rosa* at 79 n.5.  Of note here, numerous district court decisions have held that the ALJ has a "heightened duty" to develop the record where mental impairment is at issue.  *See Hidalgo v. Colvin*, No. 12-cv-9009

(LTS), 2014 WL 2884018, at \*4 (S.D.N.Y. June 25, 2014) (duty to develop record of mental illness is particularly important due to difficulty in determining "whether these individuals will be able to adapt to the demands or 'stress' of the workplace") (quoting SSR 85-15); *see also Cassandra S. v. Kijakazi*, No. 22-cv-328 (MPS)(RMS), 2023 WL 2867068, at \*12 (D. Conn. Jan. 30, 2023) (collecting decisions); *Gabrielsen v. Colvin*, No. 12-cv-5694 (KMK)(PED), 2015 WL 4597548, at \*4 (S.D.N.Y. July 30, 2015) (collecting decisions).

### a. No obvious gaps in treatment record

Although the record includes only two medical encounters during the twenty months between October 2018 and June 2020, plaintiff does not point to any missing treatment records. On similar facts, the Second Circuit rejected a claim that the ALJ failed to develop the record where the claimant "has not identified any missing medical records that should have been included in the record, and we are aware of none." *Schillo v. Kijakazi*, 31 F.4th 64, 76 (2d Cir. 2022); *see also, e.g.*, *Crespo v. Comm'r of Soc. Sec.*, No. 3:18-cv-00435 (JAM), 2019 WL 4686763, at \*5 (D. Conn. Sept. 25, 2019) (plaintiff's motion did not indicate whether she actually had additional treatment notes during relevant period); *Butler v. Comm'r of Soc. Sec.*, No. 18-cv-5293 (PGG)(SN), 2019 WL 4545639, at \*6 (S.D.N.Y. Aug. 14, 2019) (no error where plaintiff "has not identified any sources that the ALJ failed to explore").  Put another way, the ALJ had no obligation to seek additional treatment records because there were "no obvious gaps." *See Rosa*, 168 F.3d at 79 n.5.

### b.  Record sufficient without medical source statements

Plaintiff also argues that the record was inadequately developed because the ALJ did not request source statements (i.e., medical opinions)[3] from physiatrist Dr. Tung, VA psychologist Dr. Dealwis, or VA PCP Dr. Sorial.

### i.  Standard re: adequacy of RFC opinion evidence

While medical source statements are valuable insofar as they "afford[ ] physicians the opportunity to explicitly assess the claimant's limitations and RFC, a necessary component of developing the record," *Angelica M. v. Saul*, No. 3:20-cv-727 (JCH), 2021 WL 2947679, at *6 (D. Conn. July 14, 2021) (citing *Tankisi v. Comm'r of Soc. Sec.*, 521 F. App'x 29, 33-34 (2d Cir. 2013)), a "medical opinion providing the specific restrictions reflected in the ALJ's RFC determination . . . is not required when 'the record contains *sufficient evidence* from which an ALJ can assess the [claimant's] residual functional capacity.'"  *Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 109-10 (2d Cir. 2020) (quoting *Tankisi* at 34) (emphasis added).

"Sufficient evidence" is not a bright-line standard.  The determination of whether the ALJ has adequate evidence to make an RFC determination is made "on a case-by-case basis," *Faussett v. Saul*, No. 3:18-cv-738 (MPS), 2020 WL 57537, at *3 (D. Conn. Jan. 6, 2020), and "focuses on circumstances of the particular case, the comprehensiveness of the administrative record, and, at core, whether an ALJ could reach an informed decision based on the record." *Sanchez v. Colvin*, No. 13-cv-6303 (PAE), 2015 WL 736102, at *5 (S.D.N.Y. Feb. 20, 2015) (citing *Tankisi*).

---

[3] "A medical opinion is a statement from a medical source about what you can still do despite your impairment(s)[.]"  20 C.F.R. § 404.1513(a)(2).

For example, in the seminal *Tankisi* decision, the Second Circuit found sufficient evidence where the medical records were "extensive," "voluminous," and included "an assessment of [the claimant's] limitations from a treating physician."  521 F. App'x at 34.  But even in the absence of an assessment of limitations by a treating physician, other evidence may suffice to make an adequate record on the RFC issue, such as the report of a consultative examiner in addition to the treatment history.  *See*, *e.g.*, *Enid C. v. O'Malley*, No. 3:22-cv-1502 (SVN), 2024 WL 1152610, at *4 (D. Conn. Mar. 18, 2024) (treatment notes with report of consultative examiner shed adequate light on how claimant's psychological and physical impairments affected her ability to work).  Additionally, although it is the ALJ's affirmative obligation to develop the record, a represented claimant's[4] confirmation that the record is complete and/or failure to adduce inconsistent evidence may further support a conclusion that there were no obvious gaps in the record.  *See Cook v. Comm'r of Soc. Sec.*, 818 F. App'x 108, 110 (2d Cir. 2020) ("because [the plaintiff] failed to adduce any medical evidence inconsistent with the ALJ's determinations, the ALJ was not faced with any clear gaps in the administrative record that gave rise to an affirmative obligation to seek a medical opinion") (citation and quotation marks omitted); *Alex C.*, 2023 WL 2865103, at *16 (counsel was provided with opportunity to supplement record and confirmed at hearing that record was complete, which bolstered court's conclusion that ALJ was not obligated to seek treating source opinions).

In short, the ALJ need not seek additional RFC opinions "where the record is clear and, typically, where there is *some* useful assessment of the claimant's limitations from a medical

---

[4] Plaintiff's brief included several citations to cases involving a *pro se* claimant.  Because the ALJ has a uniquely heightened duty to develop the record where the claimant is unrepresented, *see Guillen v. Berryhill*, 697 F. App'x 107, 108 (2d Cir. 2017), those decisions are less applicable and are not discussed herein.

source." *Staggers v. Colvin*, No. 3:14-cv-717 (JCH), 2015 WL 4751123, at *3 (D. Conn. Aug.

11, 2015).

### ii.  ALJ adequately developed opinion evidence

Applying this standard, the present circumstances did not require the ALJ to seek medical

source statements from Drs. Tung, Sorial, or Dealwis.  To review the treatment timeline,

physiatrist Dr. Tung saw plaintiff monthly between May and October 2018 regarding her

complaints of headaches and cognitive issues after she suffered the March 2018 TBI in a motor

vehicle collision.  R. 323-34.  VA PCP Dr. Sorial saw plaintiff three times between August 2020

and March 2021 to discuss overall health but only once in person, and she did not address the

cognitive issues.  R. 407-08, 2201-03, 2275-77.  Plaintiff saw VA psychiatrist Dr. Dealwis seven

times between September 2020 and January 2022 but never in person.  R. 394, 2296-97, 2400-

04, 2439-40, 2476.

Plaintiff criticizes the lack of opinions from these treating sources as a matter of abstract

procedure but cites inapposite decisional law and fails to identify a factual gap in the record that

such opinions would be necessary to fill.  The brief vaguely accuses the ALJ of "playing doctor,"

and cites cases holding that an ALJ may not substitute her own opinion for that of treating

physicians.  *See* ECF 17-1 at 23-24.  However, the cited cases are inapposite because they

address the quality of the ALJ's factual analysis – i.e., the substantial evidence standard – rather

than the completeness of the record itself. [5]  For example, plaintiff cites a decision holding that

---

[5] Whether the record has "sufficient evidence" to permit an RFC determination is a legal question
and is subject to a different analysis than the factual question of whether the RFC determination
is supported by substantial evidence.  *See, e.g.*, *Tankisi*, 521 F. App'x at 33-35 (analyzing
sufficiency of the record separately from substantiality of the evidence); *see also Luz S. v.
Kijakazi*, No. 3:20-cv-1573 (JCH), 2022 WL 875690, at *5 (D. Conn. Mar. 24, 2022) (citing
evidence of plaintiff's severe chronic pain "not to call into the question the ALJ's ultimate RFC
findings, but rather to emphasize . . . the gap in the record"); *Crespo*, 2019 WL 4686763, at *4

"where the medical findings in the record merely diagnose the claimant's exertional impairments and do not relate these diagnoses to specific residual functional capabilities such as those set out in 20 C.F.R. § 404.1567(a) . . . the Commissioner may not make the connection himself."  *See Robles v. Saul*, No. 3:19-cv-1329 (TOF), 2020 WL 5405877, at *6 (D. Conn. Sept. 9, 2020). This formulation traces back to a First Circuit decision analyzing whether a factual determination was supported by substantial evidence, with no discussion of the legal adequacy of the ALJ's development of the record.  *See Rosado v. Sec'y of Health & Hum. Servs.*, 807 F.2d 292, 293-94 (1st Cir. 1986).  The Second Circuit has similarly instructed that an "ALJ cannot arbitrarily substitute his own judgment for competent medical opinion," *McBrayer v. Sec'y of Health & Hum. Servs.*, 712 F.2d 795, 799 (2d Cir. 1983), but, like the First Circuit in *Rosado*, has applied this principle in analyzing whether an ALJ's factual determination was supported by substantial evidence, as opposed to whether the record was adequately developed.  *See McBrayer* at 798-99 (ALJ lacked substantial evidence to support finding as to onset of blindness); *Rosa v. Callahan*, 168 F.3d at 78-79 (ALJ baselessly rejected opinion of treating physician); *Gavazzi v. Berryhill*, 687 F. App'x 98, 100 (2d Cir. 2017) (same); *Schillo v. Kijakazi*, 31 F.4th 64, 75 (2d Cir. 2022) (same); *Rivers v. Kijakazi*, No. 21-1935-cv, 2023 WL 2485467, at *2-3 (2d Cir. Mar. 14, 2023) (ALJ's discussion of "the type of medical treatment one would expect" for someone in plaintiff's situation was not based in competent medical opinion).  Thus, plaintiff's assertion that the ALJ "played doctor" does not inform the question of whether there was a gap in the present record.

If plaintiff's argument is that the record lacked sufficient evidence to permit the ALJ to make an informed decision on plaintiff's functional limitations, that is incorrect: the ALJ

("To the extent that [plaintiff's] claims are contesting the RFC assessment itself, that argument goes to the substantiality of the evidence rather than the sufficiency of the record.").

obtained both physical and mental consultative examinations in March 2021 addressing plaintiff's physical and mental impairments. Examining internist Dr. Reiher, who was aware of the TBI, examined plaintiff and found mild postural limitations and no speech limitation. R. 340-43. Examining psychologist Dr. Hillbrand was likewise aware of the 2018 concussion and opined as to the extent of plaintiff's cognitive impairments. R. 345-48. The ALJ found Dr. Reiher's opinion somewhat persuasive, adopting his postural findings and discounting only the degree of restriction in reaching and vision, R. 25, which plaintiff has not contested. And although the ALJ's decision states that she found Dr. Hillbrand's opinion "unpersuasive," the ALJ's analysis of the paragraph B criteria (R. 19-20) and her RFC restrictions of simple routine tasks, no production pace work, and occasional interaction with the general public (R. 21) are largely consistent with Dr. Hillbrand's findings (R. 347-48) except that the ALJ found only a moderate limitation – as opposed to "moderate to marked" – in responding appropriately to usual work situations and changes in routine and in maintaining concentration, persistence, and pace.

Furthermore, if plaintiff's argument is that the ALJ's partial rejection of Dr. Hillbrand's opinion created a gap in the record that categorically required further development, that also is not the rule. Instead, the adequacy of the record must be examined on a case-by-case basis. For example, in *Pellam v. Astrue*, the Second Circuit found that even where the record contained no opinion from a treating source and the ALJ partially rejected the consultative examiner's findings, there was no obvious gap because the CE's report "largely supported the ALJ's assessment of [the claimant's] residual functional capacity." 508 F. App'x 87, 90 (2d Cir. 2013). Similarly in the present case, although the ALJ did not fully adopt the opinions of the consultative examiners, her RFC determination is generally consistent with those opinions, such

that there was no obvious gap that required additional opinions from Drs. Tung, Sorial, and Dealwis.

In sum, plaintiff has not identified any obvious gaps in the record that required further development. The ALJ obtained reports from consultative examiners that addressed the limitations discussed in plaintiff's brief, and although the ALJ did not adopt the CE's opinions in their entirety, her findings are generally consistent with them, and she cited record evidence to explain the divergences. *See*, *e.g.*, *Pellam* at 90. Moreover, the record contains 2170 pages of medical records; plaintiff's counsel did not object to the lack of medical opinions when given the opportunity at the hearing; Dr. Tung himself opined from May to October 2018 that plaintiff's work restriction was "light duty," similar to the ALJ's 2022 finding; and plaintiff's brief does not identify any material inconsistencies between the treatment records and the RFC determination. Because "the record is clear and . . . there is some useful assessment of the claimant's limitations from a medical source," *Staggers*, 2015 WL 4751123, at *3, further development of the opinion evidence was not required, and there was no legal error.

### 2. No severe cognitive impairment

Plaintiff next argues that ALJ erred in finding at Step 2 that plaintiff's cognitive issues were not severe. However, substantial evidence supports the ALJ's finding.

The cognitive issues originated from the March 2018 TBI. In May 2018, physiatrist Dr. Tung diagnosed post-concussive headaches and neurocognitive deficits relating to attention, short term memory, word finding and emotional lability. R. 323. In August 28, 2018, plaintiff obtained a neurocognitive screening by psychologist Dr. Cheyne, which showed "a variable set of cognitive skills, spanning the low average to average range," with word finding difficulty; difficulty in concentrating and memory; and challenges in the domain of working memory. R.

594-95.  In October 2018, Dr. Tung referred plaintiff for speech/neurocognitive therapy and social work evaluations but she "no showed" at the November 6, 2018 appointment.  R. 584-87, 597.  Meanwhile, between August 2018 (R. 560) and November 2020 (R. 1602, 1611), plaintiff struggled with opiate and benzodiazepine abuse.  Her only medical treatment during that period was at the ER in the context of substance abuse until she established more regular care at the VA in August 2020.  R. 475.  The VA records from psychiatrist Dr. Dealwis and PCP Dr. Sorial between August 2020 and January 2022 do not state any concerns or diagnoses concerning cognitive problems.  R. 394, 407-08, 452, 475-78, 2275-79, 2285, 2287, 2296-97, 2301-03, 2400-04, 2439-40, 2476.  In fact, after Dr. Cheyne's screening in August 2018, there was no analysis of cognitive issues until psychologist Dr. Hillbrand's consultative examination in March 2021.  Based on his examination, including a COGNISTAT test on which scores were average except for judgment, Dr. Hillbrand concluded that plaintiff was functioning "near the average range" and found only mild impairments in making judgments on simple work-related decisions; understanding and remembering complex instructions; carrying out complex instructions; and making judgments on complex work-related decisions.  R. 346-48.  However, he noted that plaintiff had "some attention and concentration challenges" and found marked to moderate impairment in maintaining attention, concentration and pace.  R. 348.

To summarize, since October 2018 at the latest, there has been no diagnosis of cognitive impairment, and the only indication of any less than average cognition were the attention and concentration challenges noted in Dr. Hillbrand's March 2021 examination.  Substantial evidence supports the ALJ's conclusion that the headaches and cognition issues had resolved and the TBI history did not more than minimally impact her ability to perform basic work activities.  R. 18.  Furthermore, even assuming that the ALJ erred in finding the cognitive issues to be non-severe,

any such error would be harmless given that she considered plaintiff's cognitive limitations at subsequent points in the sequential evaluation, including in her assessment of the paragraph B mental health criteria at Step 3 (R. 19-20) and in the RFC analysis with respect to Dr. Hillbrand's opinion (R. 23-25). *See Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) (harmless error where ALJ proceeded past Step 2 and "specifically considered" the non-severe impairments in subsequent steps).

### 3. No reversible VE error

Plaintiff's final argument is that the testimony of the vocational expert ("VE") regarding numbers of available jobs in the national economy was unreliable. Here, in response to a hypothetical posed by the ALJ that mirrored claimant's RFC, the VE identified multiple occupations based on the Dictionary of Occupational Titles ("DOT") that claimants could perform with such limitations. The DOT is a U.S. Department of Labor publication that "gives a job type a specific code" and "establishes, among other things, the minimum skill level and physical exertion capacity required to perform that job." *Brault v. Soc. Sec. Admin., Com'r*, 683 F. 3d 443, 446 (2d Cir. 2012). However, because the DOT only defines jobs but lacks data as to how many such jobs are available in the national economy, vocational experts typically rely on the job numbers listed in the Standard Occupational Classifications ("SOC") groupings published by the Bureau of Labor Statistics. *Id.* Unfortunately, because numerous DOT job titles fit within each SOC group, the VE has to decide how many of the total jobs in the broad SOC group should be apportioned to a particular DOT title that claimant can perform – in other words, as the Second Circuit has observed "a VE must use some method for associating SOC-based employment numbers to DOT-based job types." *Brault*, 683 F.3d at 446.

Plaintiff attempts to convert this description of the VE's process in *Brault* into a rule stating that the VE must always explain her method for apportioning job numbers from the SOC group to specific DOT titles and must identify her sources for that method.  ECF 17-1 at 33. However, the Second Circuit declined to impose such a requirement in *Brault*.  *See* 683 F.3d at 450 (noting "the marked absence of any applicable regulation or decision of this Court requiring a vocational expert to identify with greater specificity the source of his figures or to provide supporting documentation").  Seven years later, the Supreme Court also declined to issue a categorical rule that the VE must always provide information showing how she derived her job availability numbers.  *See Biestek v. Berryhill*, 139 S. Ct. 1148 (2019) (rejecting proposed rule that testimony of VE can never clear substantial evidence bar if VE refuses request for supporting data re: job numbers).  Instead, the Supreme Court reinforced that the substantial evidence standard requires a case-by-case inquiry that "takes into account all features of the vocational expert's testimony, as well as the rest of the administrative record.  And in so doing, it defers to the presiding ALJ, who has seen the hearing up close."  *Id.* at 1157.

Courts have upheld decisions at Step 5 where the VE acknowledged the need to apportion broad SOC numbers to specific DOT titles, even where the method was not explained.  *See*, *e.g.*, *Brault*, 683 F.3d 443 (finding that ALJ met Step 5 burden where VE effectively attributed portion of broader SOC number particular DOT title and claimant's attorney was given a full opportunity to explore the issue); *Kennedy v. Astrue*, 343  F. App'x 719, 722 (2d Cir. 2009) (affirming where "the vocational expert acknowledged that the data on which she relied in determining the existence of 'charge-account clerk' positions . . . also encompassed approximately 59 other DOT titles" but "arrived at her estimated figures for charge-account clerk positions by discounting from the total numbers for all 60 DOT titles."); *see also Jones-Reid v.*

*Astrue,* 934 F. Supp. 2d 381, 407 and n.13 (D. Conn. 2012) (affirming although VE's reduction methodology was not fully explained because it was not wholly arbitrary and provided fair estimate of available jobs); *Fox v. Comm'r of Soc. Sec.*, No. 6:02-cv-1160 (FJS)(RFT), 2009 WL 367628, at *3 (N.D.N.Y. Feb. 13, 2009) (affirming where VE explained that DOT "system monitor" job was small percentage lower than overall SOC grouping). On the other hand, courts are likely to remand if the VE did not apportion the SOC numbers at all, i.e., if the VE relied "on incidence data for broad occupational groups that included positions other than those the claimant could perform *without* offering an opinion as to how many positions existed for the jobs the claimant could perform." *Kelly v. Berryhill*, No. 3:17-cv-1703 (VLB), 2019 WL 1332176, at *16 (D. Conn. Mar. 25, 2019) (emphasis in original) (remanding where VE cited job numbers for entire SOC group and did not apportion to specific DOT titles that plaintiff could perform within his limitations) (citing *Rosa v. Colvin*, No. 3:12-cv-170 (LEK)(TWD), 2013 WL 1292145 at *9-10 (N.D.N.Y. Mar. 27, 2013); *Johnston v. Barnhart*, 378 F.Supp.2d 274 (W.D.N.Y. 2005)); *see also Bridget C. v. Kijakazi*, No. 3:20-cv-1740(SRU)(SDV), 2022 WL 617605, at *14-17 (D. Conn. Feb. 5, 2022) (remanding where VE failed altogether to apportion job numbers from broad SOC group to specific DOT titles).

In the present case, although the VE did not explicitly state that she apportioned the job numbers in the SOC grouping to the specific DOT titles, it is clear that she did. The undersigned has taken judicial notice of the BLS website to confirm that the VE apportioned smaller job numbers to particular DOT titles than the total job numbers in the corresponding SOC groups. [6]

---

[6] *See* Fed. R. Evid. 201(b)(2) (court may take judicial notice of matters that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned"); *Vill. Green At Sayville, LLC v. Town of Islip*, 43 F.4th 287, 299 (2d Cir. 2022) (court may take routine judicial notice of documents from official government websites).

And plaintiff does not claim otherwise.  Instead, she challenges the VE's failure to explain her apportionment methodology.

There is no dispute that the VE did not explain her method. [7]  R. 66.  But the mere omission of such explanation is not reversible error, *see Brault* and *Biestek*, *supra*, and plaintiff does not articulate in any more specific way how the VE's testimony failed to qualify as substantial evidence supporting the ALJ's job numbers determination. [8]  *See Brault*, 683 F.3d at 450 ("We do not hold that an ALJ never need question reliability, and we agree with the Seventh Circuit that evidence cannot be substantial if it is conjured out of whole cloth" but "the extent to which an ALJ must test a VE's testimony is best left for another day and a closer case") (citation and quotation marks omitted).  Also, to the extent that plaintiff is criticizing the vagueness of the VE's testimony, plaintiff's counsel did not take the opportunity to follow up with clarifying questions.  *Cf. Johnson v. Saul*, No. 3:19-cv-1222 (SALM), 2020 WL 6562402, at *7-10 (D. Conn. Nov. 9, 2020) (ALJ did not err in citing plaintiff's counsel's failure to cross-examine VE at hearing as grounds for overruling his objection to reliability of VE's testimony).  In sum, plaintiff

---

[7] Following is the relevant colloquy between plaintiff's counsel and the VE:
    Q. [W]hat is the source of the numbers that you provided today?
    A. They come from the Department of Labor, Bureau of Labor and Statistics.
    Q. Okay. And does the Bureau of Labor Statistics break down by specific
       DOT code, or are these numbers for SOC groups?
    A. They are for SOC groups.  The Department of Labor does not specify
       specific numbers for specific DOT codes.
    Q. All right, thank you. I have nothing further.
R. 66.

[8] Plaintiff separately argues that the hypothetical the ALJ provided to the VE was defective because the ALJ did not obtain opinions from treating physicians on the subject.  ECF 17-1 at 35-37.  However, that is just a reiteration of plaintiff's first claim of error, which is addressed above.

points to no basis for this Court to conclude that the VE's testimony was unreliable or otherwise failed to constitute substantial evidence to support the ALJ's Step 5 finding.

### E. CONCLUSION

For the foregoing reasons, the undersigned finds no error in the ALJ's development of the record, the ALJ's finding that plaintiff's cognitive impairment was non-severe, and the ALJ's reliance on the job incidence numbers supplied by the vocational expert. The undersigned recommends that plaintiff's Motion to Reverse the Decision of the Commissioner, ECF 17, be DENIED, and the Commissioner's Motion to Affirm, ECF 20, be GRANTED.

Any party may seek the district court's review of this recommended ruling. *See* Fed. R. Civ. P. 72(b)(2) (written objections to proposed findings and recommendations must be filed objections to recommended ruling due fourteen days after being served). Failure to file timely objections will preclude appellate review. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72 and 6(a); D. Conn. L. Civ. R. 72.2; *Small v. Secretary of H.H.S.*, 892 F.2d 15 (2d Cir. 1989) (per curiam); *F.D.I.C. v. Hillcrest Assoc.*, 66 F.3d 566, 569 (2d Cir. 1995).

SO ORDERED, this 12th day of June, 2024, at Bridgeport, Connecticut.


*/s/ S. Dave Vatti*
S. DAVE VATTI
United States Magistrate Judge